# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------

RARITAN BAYKEEPER, INC. (d/b/a NY/NJ
BAYKEEPER),
　　　　　　　Plaintiff,

v.

FORTUNE METAL GROUP, INC., FORTUNE
RIVERSIDE AUTO PARTS, INC., and NORMAN NG,
　　　　　　　Defendants.

-------------------------------------------------------------

Case No. _____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Raritan Baykeeper, Inc., by and through its counsel, hereby alleges:

## I.　INTRODUCTION

1.　This action is brought by Plaintiff Raritan Baykeeper, Inc. (d/b/a NY/NJ Baykeeper), 1222 Route 36, Suite 4, Hazlet NJ 07730 ("Plaintiff"), against Defendants Fortune Metal Group, Inc., Fortune Riverside Auto Parts, Inc., Fortune Eighth, Inc., Fortune Group, 900 Leesville Ave., Rahway, NJ 07305 (together, "Defendants"), to address and abate Defendants' ongoing and continuous violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA").

2.　Defendants discharge industrial stormwater from two scrap metal processing facilities located at 900 Leesville Ave., Rahway, NJ 07305 into the Rahway River in violation of the Clean Water Act, §§ 301(a), 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New Jersey Department of Environmental Protection ("DEP") New Jersey Pollution Discharge Elimination System ("NJPDES") Scrap Metal Processing and Recycling Industrial Stormwater General Permit, Permit No. NJ0163261 (July 25, 2013) (the "Scrap Metal Permit"). The facilities located at this address include the Fortune Riverside Auto Parts, Inc. Facility ("Fortune 1 Facility") and

the Fortune Riverside Auto Parts, Inc. Non-Ferrous Facility ("Fortune 2 Facility") (collectively referred to herein as "Fortune Facilities" or "Facilities").

3.     Defendants' violations of the Scrap Metal Permit and the Clean Water Act include: inadequate pollution control measures; inadequate pollution prevention and stormwater control plans; and failures to comply with Defendants' duty to mitigate the harms of their noncompliance with the Scrap Metal Permit.

4.     Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into the Rahway River and other waters in this District. The State of New Jersey has designated more than 18,000 river miles, 46,000 acres of larger waterbodies, and 630 square miles of bays and estuaries in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation. Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation. In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded. For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.     Defendants' stormwater discharges contribute to this endemic stormwater pollution problem. Defendants engage in industrial activities outdoors, such as the purchase, collection, processing, storage, reshipment, and resale of scrap metal and the operation and storage of industrial equipment. The Facilities have has exposed and continues to expose

industrial pollutants to stormwater, at a minimum, by: (a) the crushing, processing, recycling, and storing of scrap metal, vehicles, and other recyclable wastes; (b) storing waste materials outdoors; and (c) maintaining and storing machinery and related parts outside and otherwise exposing them to the elements. Whenever precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby waters.

6.      Stormwater discharges flow from the Fortune Facilities into the Rahway River. Contaminated stormwater discharges such as those from the Facilities can and must be controlled to the fullest extent required by law to preserve and improve the condition of these waters.

## II.    JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over the parties and this action pursuant to the Clean Water Act, § 505(a)(1), 33 U.S.C. § 1365(a)(1) (the citizen suit provision of the CWA), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

8.      On July 11, 2025, Plaintiff provided notice of Defendants' violations of the Clean Water Act and of its intention to file suit against Defendants ("Notice Letter") to the Defendants and Defendants' registered agents; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the DEP, as required by the Act under Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and its implementing regulations, 40 C.F.R. §§ 135.1–135.3. A true and correct copy of Plaintiff's Notice Letter is attached to this Complaint as Exhibit A and is incorporated herein by reference.

9.      More than sixty days have passed since the Notice Letter was served on Defendants and the State and federal agencies. Plaintiff has complied with the Clean Water Act's notice requirements under Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

10.     Neither the EPA nor the State of New Jersey has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this Complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

11.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

12.     Venue is proper in the United States District Court for the District of New Jersey pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.     PARTIES

13.     Plaintiff Raritan Baykeeper, Inc., doing business as NY/NJ Baykeeper, is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary through enforcement, field work, and community action. Baykeeper's mission includes safeguarding the environmental, recreational, and commercial integrity of the Hudson-Raritan Estuary and its ecosystem, including the watersheds of the Rahway River. Baykeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums. To further its mission, Baykeeper actively seeks federal and state implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

14.     Baykeeper has at least 350 members in the New York and New Jersey region, many of whom use and enjoy the waters of the Hudson-Raritan Estuary—including the Rahway River, which is polluted by industrial stormwater runoff from Defendants' Facility.

15.     Plaintiff's members reside near to, use, and enjoy the waters that Defendants are polluting. Plaintiff's members use those areas to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, study nature and the sciences, and engage in spiritual and religious practices, among other activities. Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses. Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the Scrap Metal Permit.

16.     For example, one Baykeeper member resides about 500 feet from the Rahway River, and has lived on the same street for most of their life. This member has always enjoyed watching local wildlife, but there is less wildlife to watch and enjoy because the waters that the wildlife rely on are polluted. This member works as a professional nature photographer, and specifically takes and sells photographs of the Rahway River and local wildlife. This member's photography business is harmed by water pollution, as there is less wildlife to photograph and there are visible pollutants in the waters that this member enjoys photographing.  This member has a deep emotional and spiritual connection to the River and finds solace in spending time outdoors, immersed in nature. This member's knowledge and observations of pollution in the Rahway River and Raritan Bay, including industrial stormwater pollution, saddens them and lessens their enjoyment derived from spending time outdoors. This member is thus harmed by uncontrolled discharges of stormwater from industrial facilities to the Rahway River.

17.     The relief sought herein will redress the harms caused to Plaintiff and its members

by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm Plaintiff has no other plain, speedy, or adequate remedy at law.

18.     Plaintiff brings this action on behalf of itself and its members. Plaintiff's interest in reducing Defendants' discharges of pollutants into the Rahway River and requiring Defendants to comply with the requirements of the Scrap Metal Permit are germane to Plaintiff's purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Plaintiff.

19.     Defendant Fortune Metal Group Inc. is a corporation formed and existing under the laws of the State of New Jesey, with a principal business address of Leesville Avenue, Rahway NJ 07065.

20.     Defendant Fortune Riverside Auto Parts Inc. is a corporation formed and existing under the laws of the State of New Jersey, with a principal business address of 900 Leesville Avenue, Rahway NJ 07065.

21.     Defendant Norman Ng is registered with the New Jersey Department of Revenue as the Chief Executive Officer of Defendant Fortune Metal Group Inc. and the President of Defendant Fortune Riverside Auto Parts Inc.

22.     On information and belief, Defendants own and operate, or participate in the ownership and operation of, the scrap metal processing facilities located at 900 Leesville Ave., Rahway, NJ 07305 (the "Facilities") that are the subject of this Complaint.

23.     On information and belief, Defendants have operated the Facility since at least July 11, 2020.

## IV.     STATUTORY AND REGULATORY BACKGROUND

### A.     <u>The Clean Water Act</u>

24.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

25.     The Clean Water Act, Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge complies with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. A NPDES permit requires dischargers of pollution to comply with various limitations.

26.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA. CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

27.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

28.     The Clean Water Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge

of all pollutants." 33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard). The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of "conventional pollutants." *Id.* § 1311(b)(2)(E) (i.e., the "BCT" standard) (together, the "BAT/BCT Standard").[1] *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

29.    The Clean Water Act further requires any NPDES permit issued by a state to contain any additional limits necessary to ensure compliance with that state's water quality standards. *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards"), 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

30.    New Jersey's surface water quality standards set numeric and narrative criteria for different water pollution parameters. See generally N.J.A.C. 7:9B-1.14 (outlining quantitative and qualitative standards, respectively). A waterbody must meet these numeric and narrative criteria in order to support its designated uses. *See id.* 7:9B-1.5.

## B.    New Jersey's General Permit for Discharge of Stormwater Associated with Scrap Metal Processing and Recycling Activity

31.    In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

32.    Pursuant to Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), EPA

---

[1] "Conventional pollutants" are defined by statute, 33 USC § 1314(a)(4), and by regulation, 40 CFR § 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

promulgated stormwater discharge regulations at 40 C.F.R. § 122.26, which cited abundant data

showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the

nation. In particular, EPA found that runoff from industrial facilities contained elevated pollution

levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order

of magnitude the levels discharged by municipal sewage treatment plants. 55 Fed. Reg. 47990,

47991 (Nov. 16, 1990).

33.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26

require NPDES permits for stormwater discharges "associated with industrial activity."

34.     As a delegated state NPDES permitting agency, DEP has the authority to issue

NPDES permits in New Jersey, known as "NJPDES" permits. DEP has elected to issue a

statewide general NJPDES permit for industrial stormwater discharges from scrap metal

processing and recycling facilities (*i.e.*, the "Scrap Metal Permit," *supra* ¶ 2). DEP also has the

authority to issue NJPDES permits for individual applicants.

35.     As a state-issued, delegated NPDES permit, the Scrap Metal Permit requires

permittees to use measures that reflect, and prohibit the discharge of pollutants above the level

commensurate with, application of the BAT/BCT Standard. The Scrap Metal Permit implements

these federal standards by imposing effluent limitations that require permittees to adopt control

measures referred to as Best Management Practices ("BMPs") to control or abate the discharge

of pollutants from the Facility. BMPs, as defined by New Jersey Administrative Code 7:14A-1.2,

are "schedules of activities, prohibition of practices, maintenance procedures, and other

management practices to prevent or reduce the pollution of waters of the State," and "methods,

measures, or practices selected by an agency to meet its nonpoint source control needs." *See also*

*Technical Manual for Stormwater Permitting*, New Jersey Department of Environmental

9

Protection, February 1999, at p. 3 (explaining the BMPs set forth in the Stormwater Pollution Prevention Plan "operate as limitations and controls on stormwater discharges to prevent stormwater and surface water contamination and are intended to achieve Best Available Technology Economically Achievable (BAT) and Best Conventional Pollutant Control Technology (BCT) under the Clean Water Act.").

36.     Furthermore, as a state-issued, delegated NPDES permit, the Scrap Metal Permit prohibits permittees from causing or contributing to violations of water quality standards. Specifically, permittees are required to comply with water quality criteria set to control toxic pollutants, including but not limited to lead, zinc, and copper. *See* Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(4)(i)); *see also* N.J.A.C. 7:9B-1.14(d), (f), (g) (setting forth New Jersey's water quality criteria for toxic pollutants).

37.     In order to discharge polluted stormwater lawfully in New Jersey, scrap metal facilities must either obtain coverage under the Scrap Metal Permit and comply with its terms or obtain coverage under and comply with an individual NJPDES permit. 33 U.S.C. § 1311(a).

### C.    The Scrap Metal Permit Framework

38.     The Scrap Metal Permit ensures compliance with federal technology BAT/BCT Standard and water-quality requirements by imposing a variety of conditions. All of the Scrap Metal Permit's conditions constitute enforceable "effluent standards or limitations" within the meaning of the Clean Water Act's citizen suit provision. 33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

39.     First, the Scrap Metal Permit establishes eligibility conditions that permittees must meet to obtain coverage. Scrap Metal Permit, Part II.C.1. Permittees apply for coverage under the Scrap Metal Permit by submitting an application in accordance with instructions

posted to DEP's Division of Water Quality website. Scrap Metal Permit, Part II.C.2.

40.    When submitting an application for coverage, the applicant must identify the specific outfalls through which it will discharge industrial stormwater. *See NJPDES Permit Application*, DEP DIV. WATER QUALITY, Form No. NJPDES-1, at 2 (last revised Dec. 16, 2024), *available via Permits, Application Forms, & Checklists*, DEP DIV. WATER QUALITY, https://dep.nj.gov/dwq/permitting_information/permits_application_forms_and_checklists/#DST (last updated Aug. 21, 2025) (applicant is instructed to provide detail regarding "each discharge which is the subject of this application"); *see also* Scrap Metal Permit, Part II.C.3.c (requiring permittee to submit updated information to DEP if the most recent application is no longer accurate).

41.    A permittee may thus only lawfully discharge stormwater associated with industrial activity from the outfalls identified in its application for coverage. *Id.*, Part II.B.6 ("The permittee shall discharge stormwater to surface waters and/or ground waters of the State only as authorized herein and consistent with the terms and conditions of this permit.").

42.    Next, the Scrap Metal Permit sets forth a variety of effluent limitations that all permittees must meet. These include narrative effluent limitations on pollutants and narrative effluent limitations that impose mandatory BMPs. *See id.*, Parts IV.C–E.

43.    As noted above, the Scrap Metal Permit also imposes narrative and numeric effluent limitations by requiring compliance with water quality criteria set to control toxic pollutants. *See id.*, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(4)(i)).

44.    Permittees typically meet the Scrap Metal Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting site-specific BMPs in addition to the mandatory BMPs required by the

11

Scrap Metal Permit, including but not limited to BMPs specifically recommended in the Scrap Metal Permit. *See id.*, Part IV.H. These BMPs include changes to industrial practices and activities (*e.g.*, housekeeping schedules and employee training) and structural improvements (*e.g.*, roofing to minimize exposure of pollutants to stormwater, or collection basins that reduce the volume of stormwater discharged from the facility). The permittee must select, design, install, and implement BMPs in accordance with good engineering practices to meet the effluent limits contained in the Scrap Metal Permit. *See generally id.*, Parts IV.A.1, F.

45.    The permittee must record the BMPs used to meet the Scrap Metal Permit's effluent limits in a Stormwater Pollution Prevention Plan ("SPPP"), which must include a Drainage Control Plan ("DCP") that sets forth measures to control stormwater flow within and from their facility. The permittee must develop, implement, and continually update these stormwater pollution control plans. *See id.*, Part IV.B, F.

46.    Further, permittees must track, improve upon, and report upon their performance under the Scrap Metal Permit, which requires regular inspections, monitoring, and sampling of stormwater discharges; periodic reporting; and corrective action to reduce pollution when necessary. *See id.*, Part IV.G; *see also* Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)5, 11, 7:14A-6.5, 7:14A-6.10).

47.    The Scrap Metal Permit also relies centrally on comparing the pollution levels found in a permittee's stormwater discharges to "design criteria," which are pollutant concentrations that, when exceeded, represent a "level of concern." Scrap Metal Permit, Part IV—Notes and Definitions, sub-part A.1.b.ii. The Scrap Metal Permit requires permittees to design, implement, and maintain BMPs to achieve the design criteria and "control or abate the discharge of pollutants." *Id.*, Part IV.G.4.a; N.J.A.C. 7:14A-6.2(b)(1).

48.     As EPA explained in adopting benchmarks for its general permits—which are identical in form and function to the Scrap Metal Permit's design criteria—such indicators "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995). Further, exceedances of such indicators can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

49.     Thus, the ability to achieve design criteria provides strong evidence of whether a facility has implemented control measures and BMPs sufficient to constitute compliance with the Scrap Metal Permit and the federal technology BAT/BCT Standard and water-quality based standards that it implements. Since discharge monitoring reports "must be certified by the discharger," they should be treated "as admissions that are sufficient to establish liability under the CWA." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 176 (3rd Cir. 2004).

**D.     <u>Key Conditions of the Scrap Metal Permit</u>**

50.     Within the above general framework, the following specific conditions of the Scrap Metal Permit are particularly relevant to this case.

**i.     Mandatory BMPs**

51.     The Scrap Metal Permit sets forth multiple categories of mandatory BMPs, including, *inter alia*, BMPs for scrap metal processing and recycling, and site-wide BMPs, that permittees must develop, implement, update, and maintain.

52.     The permittee must develop, implement, update, and maintain site-specific BMPs for its scrap metal processing and recycling activities. Scrap Metal Permit, Part IV.A.1.b (citing Part IV.C). These mandatory BMPs include the following: a quality control program for inbound scrap metal; a designated area for scrap metal sorting; a controlled area for scrap metal draining and dismantling; unexposed storage for specific scrap metal categories; controlled storage for

remaining scrap metal categories; and secondary containment for scrap metal processing equipment and hydraulic equipment. *Id.*, Part IV.B, C.1–6, F, H. More detail on these mandatory BMPs is provided in the Notice Letter attached hereto as Exhibit A, at 6–7, and is incorporated herein by reference.

53.     The Scrap Metal Permit also requires permittees to institute basic site-wide BMPs. Scrap Metal Permit, Part IV.A.1.b (citing Part IV.E). These mandatory BMPs include the following: basic housekeeping and sweeping procedures; a controlled fluid storage area; an unexposed area for parts cleaning and solvent degreasing; maintenance of spill kits and appropriate equipment and materials for spill recovery; and dust and erosion controls, including but not limited to site stabilization. *Id.*, Part IV.E. More detail on these mandatory BMPs is provided in the Notice Letter attached hereto as Exhibit A, at 7–8, and is incorporated herein by reference.

### ii.     SPPP Requirements

54.     As noted above, the Scrap Metal Permit requires permittees to record the BMPs and control measures used to meet the Scrap Metal Permit's effluent limitations in a Stormwater Pollution Prevention Plan ("SPPP"). Scrap Metal Permit, Part IV.B.4.a. The permittee must develop the SPPP within six months of the effective date of authorization under the Scrap Metal Permit, and the SPPP must be fully implemented within twelve months of the issuance date of authorization. *Id.*, Part IV.B.1.b. The permittee must develop, implement, and periodically update the SPPP to adapt it to changing conditions at the facility. *Id.*, Part IV.B.2.

55.     The SPPP must identify all potential sources of pollution and source materials on-site and document the practices utilized to minimize or eliminate the exposure of those sources to stormwater, including but not limited to mandatory BMPs and recommended BMPs. *See id.*, Parts IV.B.1.a, 4.a, H.

56.    The SPPP must address all stormwater discharges associated with industrial activity, including source materials; be prepared, implemented, and maintained in conformity with good engineering practices; and must include all required components. *Id.*, Part IV.B.2.a.

57.    The SPPP must "identify the BMPs in place to eliminate, reduce, or minimize exposure of industrial activity and source material to stormwater that discharges to surface water," and must address all mandatory BMPs identified in the Scrap Metal Permit. *Id.*, Part IV.B.4.a (citing Parts IV.C, D, E).

58.    The Scrap Metal Permit also requires a detailed site map to be included with the SPPP, showing the location of scrap metal and vehicle sorting, draining, dismantling, storage and stockpiling, and processing equipment; the processed vehicle storage area and the operable vehicle storage area; the cleaning and solvent degreasing area; any area where fluids are stored; the location of implemented and proposed BMPs, including structures and concrete pads; any water treatment systems, including oil/water separators, septic systems, and potable wells; and the approximate direction of stormwater flow, including drainage areas, outfalls, and adjacent surface water bodies. *Id.*, Part IV.B.4.c.

59.    The SPPP must also include, *inter alia*: a process line diagram showing the processing of scrap materials and vehicles through the facility; an inventory of source materials; and schedules and procedures for regular inspections (on at least a quarterly basis) to verify that all BMPs are being appropriately implemented. *Id.,* Part IV.B.4.b, d, f.

60.    In addition, the SPPP must include the identity and responsibilities of a SPPP implementation team; a process-line diagram showing the processing of materials through the facility; an inventory of source materials; and schedules and procedures for regular inspections to verify that all BMPs are being appropriately implemented. *Id.*, Part IV.B.4.

61.     The Scrap Metal Permit requires permittees to identify in the SPPP a SPPP team including the identity and responsibilities of the team leader and all team members. *Id.*, Part IV.B.e.

62.     The SPPP must establish a schedule for regular inspections of BMPs to be carried out at the Facility at least quarterly. *Id.*, Part IV.B.4.f. The inspections must be frequent and thorough enough to ensure that BMPs are being implemented and are functioning adequately. Inspections should be conducted during dry periods and during storm events. An inspection log of these regular inspections must be maintained in the SPPP, verifying that all BMPs are in place and identifying any failures or breakdowns of BMPs. *Id.*

### iii.     DCP Requirements

63.     As noted above, the Scrap Metal Permit also requires permittees to develop and implement a Drainage Control Plan ("DCP"), which must be submitted to DEP and thereafter maintained with the SPPP. The DCP must be updated as necessary to reflect changes at a facility. Scrap Metal Permit IV.F.3.e–g, B.4.i.

64.     The DCP ensures that all stormwater associated with a facility's industrial activity is discharged through discrete, permitted outfalls (or infiltrates to ground water), and that all other discharges of stormwater (*i.e.*, sheet flow) are eliminated. *Id.*, Parts IV.A.1.a, IV.B.4.i., IV.F.1.a. The Scrap Metal Permit requires permittees to implement drainage control and drainage monitoring for all areas of industrial activity at a facility. *Id.*, Part IV.F.1.c.

65.     To the best extent practicable, the DCP should prevent uncontrolled stormwater discharges from migrating off-site through the use of berms, barriers, and other stormwater control measures. To the extent stormwater cannot be contained on-site, it must be channeled to a discrete outfall, which must be tagged and monitored pursuant to the terms of the Scrap Metal Permit. *Id.*, Parts IV.F.1.e, F.4.a–b.

16

66.    The Scrap Metal Permit also requires that the Final DCP include a Drainage Control Map that depicts, *inter alia*, flow arrows showing drainage and the location of all surface water outfalls. *Id.*, Part IV.F.3.d.

### iv.    Inspections, Monitoring, and Reporting

67.    The Scrap Metal Permit imposes a variety of facility and BMP inspection requirements, routine discharge monitoring, and schedules for submitting reports to DEP.

68.    First, the Scrap Metal Permit requires a permittee to conduct annual inspections of their facility to assess and evaluate the efficacy of the SPPP. The permittee must inspect all areas contributing to stormwater discharges; evaluate whether the SPPP and its stormwater and pollution controls are properly implemented; and determine whether additional controls are needed. By October 1 of each year, the permittee must prepare an annual report summarizing the inspection and, if any non-compliance is identified, the steps being taken to remedy the noncompliance. The permittee must then submit an annual certification to DEP that the inspection and report have been completed. The reports and certifications must be retained with the SPPP for at least five years. *Id.*, Part IV.B.5 (incorporating N.J.A.C. 7:14A-24.9).

69.    In addition, regular inspections of BMPs must be carried out at a facility at least quarterly. The inspections must be frequent and thorough enough to ensure that BMPs are being implemented and are functioning adequately. An inspection log of these regular inspections must be maintained in the SPPP for at least five years, verifying that all BMPs are in place and identifying any failures or breakdowns of BMPs. *Id.*, Part IV.B.4.f.

70.    The Scrap Metal Permit requires a permittee to monitor stormwater discharges from their facility, sample discharges, and submit reports to DEP. Permittees must collect and analyze stormwater samples for each outfall it has identified in its Drainage Control Plan. Quarterly sampling is specifically required for all design criteria pollutants. *Id.*, Parts IV.A.1.e

(citing Parts IV.F, G), G.2, G.3, J (summarizing reports to be kept on site and reports to be submitted to DEP).

71.     The Scrap Metal Permit requires permittees to submit a quarterly discharge monitoring report ("DMR") to DEP within 25 days of the end of each quarterly monitoring period. *Id.*, Part IV.J.2.a.

### v.     Design Criteria

72.     As discussed above, the Scrap Metal Permit establishes "design criteria" that provide strong evidence of whether a facility has implemented the requisite control plans and BMPs sufficient to comply with the Scrap Metal Permit and the Clean Water Act.

73.     Permittees must compare their facility's discharges' sampling results with the design criteria defined by the Scrap Metal Permit. If there are any exceedances of the design criteria, then the permittee should assess site conditions to identify any additional controls that could reduce stormwater contamination, and must summarize the remedial actions taken in the facility's Annual Report. *Id.*, Part IV.G.4.b-c.

74.     The Scrap Metal Permit's design criteria include: $\leq 100$ mg/L for total suspended solids ("TSS"), $\leq 15$ mg/L for total petroleum hydrocarbons, $\leq 120$ mg/L for chemical oxygen demand, $\leq 0.75$ mg/L for aluminum, $\leq 0.0156$ mg/L for total recoverable copper, $\leq 1.0$ mg/L for total recoverable iron, $\leq 0.095$ mg/L for total recoverable lead, and $\leq 0.13$ mg/L for total recoverable zinc. Scrap Metal Permit, Part IV.G.4.a.

75.     In addition to monitoring design criteria, the Scrap Metal Permit requires permittees to monitor stormwater discharges for PCBs once per year to monitor the efficacy of the facility's inbound screening program (which prohibits materials likely to contain PCBs). *Id.*, Parts III, IV.C.1.a.

vi.    **Duty to Mitigate**

76.    All of these requirements are founded on a basic principle, which the Scrap Metal Permit imposes on all permittees: the duty to mitigate. Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)5, 11). The duty to mitigate is defined in two ways.

77.    First, "[t]he permittee shall take such corrective actions as required under the Federal and State Acts, and other relevant provisions of law, including, at a minimum, accelerated and/or additional types of monitoring, temporary repairs, ceasing discharge, or where ceasing discharge is not possible, other measures to mitigate the effects of violating its NJPDES permit." N.J.A.C. 7:14-6.2(a)11.

78.    The interweaving requirements detailed above—which fundamentally require permittees to make a plan, implement the plan, test the plan, and improve the plan as needed—set forth the framework within which permittees comply with their duty to minimize discharges of pollution from their industrial activities to waters of the United States.

79.    Second, "[a] permittee shall take all reasonable steps to minimize or prevent any activity in violation of its permit which has a reasonable likelihood of adversely affecting human health or the environment." N.J.A.C. 7:14A-6.2(a)5.

80.    The Clean Water Act, Section 307(a), 33 U.S.C. § 1317(a), requires the U.S. Environmental Protection Agency ("EPA") to maintain a list of toxic pollutants (the "307(a) Toxins List"). The States, including New Jersey, are required to adopt water quality criteria for all pollutants on the 307(a) toxic pollutants list. CWA § 303(c)(2)(B), 33 U.S.C. § 1313(c)(2)(B).

81.    The Scrap Metal Permit requires that permittees comply with all requirements incorporated by reference into the Permit, including but not limited to the New Jersey Administrative Code's sub-chapter "Conditions Applicable to All NJPDES Permits." N.J.A.C. Tit. 7, ch. 14A, sub-ch. 6.

82.     The Scrap Metal Permit, Part I.A.1.b, specifically incorporates that chapter's toxic pollutant requirements, N.J.A.C. 7:14A-6.2(a)(4)(i), which provides that "a permittee shall comply with . . . applicable effluent standards or prohibitions established under Section 307(a) and (c) of the [Clean Water Act] for toxic pollutants."

83.     The Scrap Metal Permit thus incorporates by reference EPA's 307(a) Toxins List.

84.     The 307(a) Toxins List currently includes copper, lead, and zinc, amongst others. 40 C.F.R. § 401.15.

85.     New Jersey's water quality criteria for toxic pollutants set forth two narrative criteria for Class FW2 waters, such as the South Branch of the Rahway River. A waterbody must meet these numeric and narrative criteria to support its designated uses. *See* N.J.A.C. 7:9B-1.4.

86.     First, for toxic substances, there must be "[n]one, either alone or in combination with other substances, in such concentrations as to affect humans or be detrimental to the natural aquatic biota, produce undesirable aquatic life, or which would render the waters unsuitable for the designated uses." N.J.A.C. 7:9B-1.14(d)12.i.

87.     Second, toxic substances "shall not be present in concentrations that cause acute or chronic toxicity to aquatic biota, or bioaccumulate within an organism to concentrations that exert a toxic effect on that organism or render it unfit for consumption." N.J.A.C. 7:9B-1.14(d)12.iii.

88.      New Jersey's water quality criteria for toxic pollutants also set forth the following numeric criteria for Class FW2 waters:

a.     Lead must not exceed 38 micrograms per liter ("µg/L") on a six-hour average (acute) or 5.4 µg/L on a four-day average (chronic). N.J.A.C. 7:9B-1.14(f).

b.     Zinc must not exceed 113.8 µg/L on both a 6-hour average (acute) and a four-day

average (chronic).[2] *Id.*

c.     Copper must not exceed 12.71 μg/L on a 24-hour average (acute) or 8.47 μg/L on a four-day average (chronic).[3] *Id.*

### E.     CWA Citizen Enforcement Suits

89.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

90.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342. CWA Section 505(f), 33 U.S.C. § 1365(f).

91.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in cases of actual controversy and grant further necessary relief based on such a declaration).

92.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

93.     Violators of the Clean Water Act are also subject to civil penalties for each violation per day up to a statutory maximum (adjusted for inflation), currently $68,445. CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.     STATEMENT OF FACTS

### A.     Metal Recycling Facilities

94.     Metal recycling facilities—especially those with outdoor stockpiling, processing, and segregation of materials—have been identified as a major source of stormwater

---

[2] Assuming a hardness value of 100 mg/L $CaCO_3$.
[3] Assuming a hardness value of 100 mg/L $CaCO_3$.

contamination. Scrap metal in different stages of corrosion and decay may release a variety of

harmful substances, including but not limited to heavy metals, fuel, oil, lubricants, PCBs, grease,

lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical

residues. 60 Fed. Reg. 50804, 50953–63, 51189–97 (listing common pollutants associated with

scrap and waste recycling facilities as of 1995 and outlining requirements for this industrial

sector); *see also Industrial Stormwater Fact Sheet Series—Sector N: Scrap Recycling and Waste

Recycling Facilities*, U.S. ENVTL. PROTECTION AGENCY, EPA-833-F-06-029 (Feb. 2021),

https://www.epa.gov/sites/default/files/2015-10/documents/sector_n_scraprecycling.pdf (listing

common pollutants associated with scrap and waste recycling facilities).

95.    In addition to the storage and processing of various sources of scrap metal, such

facilities also conduct vehicle operation and maintenance and equipment operation and storage.

Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to

areas on and off the premises. Vehicles also expose many other sources of pollution to the

elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids. *Id.*

### B.    The Fortune Facilities and Industrial Stormwater Discharges

96.    Defendants own and/or operate the Fortune Facilities, two scrap metal processing

and recycling facilities located at 900 Leesville Ave., Rahway, NJ 07065.

97.    The Fortune 1 Facility and the Fortune 2 Facility sit on opposite sides of Leesville

Avenue and each feature one driveway onto that road.

98.    The Fortune 1 Facility discharges to storm drains connected to the Woodbridge

Township Municipal Separate Storm Sewer System ("MS4"). The MS4 discharges that

stormwater, without treatment, to the adjacent South Branch of the Rahway River.

99.    The Fortune 2 Facility discharges directly into the South Branch of the Rahway

River.

100.    The South Branch of the Rahway River is a water of the United States.

101.    DEP has classified the portion of the South Branch of the Raway River to which the Facilities discharge as Class FW2-NT waters. N.J.A.C. 7:9B-1.15(e). A waterbody that is designated Class FW2 has the following designated uses: maintenance, migration, and propagation of the natural and established biota; primary contact recreation; industrial and agricultural water supply; public potable water supply after conventional filtration treatment; and any other reasonable uses. N.J.A.C. 7:9B-1.12(c).

102.    The uses supporting aquatic life in this portion of the South Branch of the Rahway River have been designated impaired by chloride, phosphorus, and total dissolved solids; DDT, dioxin, mercury, and PCBs in fish tissue; and unknown biological causes.

103.    Industrial activities at the Fortune 1 Facility include receiving and sorting scrap metals, stockpiling and processing scrap metals, processing scrap metals, and vehicle and equipment maintenance. The majority of these activities are uncovered and exposed to precipitation.

104.    Industrial activities at the Fortune 2 Facility include receiving and sorting scrap metals, storing and stockpiling scrap metals, and processing scrap metals. A significant portion of these activities are uncovered and exposed to precipitation.

105.    When it rains, the majority of stormwater from the Facilities comes from, or is commingled with runoff from, areas at the Facilities where industrial processes occur (including the roofs of the Facilities' buildings).

106.    Stormwater flowing over areas of the Facilities that are associated with Defendants' industrial activities collects a variety of pollutants, including but not limited to metals; sizeable debris and sediment; oil and grease; organic substances and chemicals that

create chemical oxygen demand; and other pollutants.

###### C.    Defendants' Scrap Metal Permit Coverage

107.    Defendants have applied for and obtained coverage under the Scrap Metal Permit. Defendants' Scrap Metal Permit identification number for the Fortune 1 Facility is NJG106445 and for the Fortune 2 Facility is NJG199770.

108.    Under the Scrap Metal Permit, Defendants are authorized to discharge stormwater into waters of the United States only through the outfalls that Defendants have identified in their DCP and quarterly and annual reports to DEP. Defendants have only identified Outfall 001A for each of the Facilities in these documents.

109.    Outfall 001A from the Fortune 1 Facility conveys stormwater from industrial areas at the Fortune 1 Facility to the MS4 which then flows to the South Branch of the Rahway River.

110.    Outfall 001A from the Fortune 2 Facility conveys stormwater from industrial areas at the Fortune 2 Facility directly to the South Branch of the Rahway River.

###### D.    Defendants Discharge Excessively Polluted Stormwater

111.    Since at least July 11, 2020, Defendants have taken samples or arranged for samples to be taken of stormwater discharges from the Facilities, which were then reported to DEP (via written discharge monitoring reports or through DEP's electronic system for submission of discharge monitoring reports online). Defendants certified each of those reports pursuant to the Scrap Metal Permit.

###### i.    Design Criteria Exceedances

112.    In these stormwater sampling results, the Facilities have consistently reported high pollutant levels that exceed applicable design criteria, which constitutes evidence of ongoing violations of effluent limitations set forth in the Scrap Metal Permit.

113.    In the past five years, the Fortune 1 Facility has reported numerous discharges of stormwater that exceeded the Scrap Metal Permit's design criteria, including total recoverable copper, aluminum, total recoverable iron, total recoverable lead, and total recoverable zinc. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, Tbl. 1, at 9–11, and are incorporated herein by reference.

114.    In the past five years, the Fortune 2 Facility has reported numerous discharges of stormwater that exceeded the Scrap Metal Permit's design criteria, including total recoverable copper, aluminum, total recoverable iron, total recoverable lead, and total recoverable zinc. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, Tbl. 2, at 11–13, and are incorporated herein by reference.

115.    The Facilites' sampling results show exceedances of these criteria in numerous samples, but most notably with respect to copper, which has exceeded the design criteria from every sample during the past five years, consistently an order of magnitude above the design criteria set forth in the Scrap Metal Permit.

116.    These design criteria exceedances are evidence of ongoing violations of the effluent limitations set forth in the Scrap Metal Permit, as detailed further below.

**ii.    Exceedances of Water Quality Criteria for Toxic Pollutants**

117.    Since at least July 11, 2020, the Facilities have self-reported numerous one-time samples of stormwater containing lead, zinc, and copper that far exceed the acute and chronic numeric water quality criteria for lead, zinc, and copper in the South Branch of the Rahway River. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, tbls. 4 and 5, at 19–22, and are incorporated herein by reference.

118.    On information and belief, these significant exceedances of acute and chronic

25

numeric water quality criteria for lead, zinc, and copper, alone or in combination, are detrimental to the natural aquatic biota, produce undesirable aquatic life, and/or render these waters unsuitable for their designated uses for primary contact recreation, industrial and agricultural water supply, or public potable water supplies.

119.    On information and belief, the concentrations of toxic substances reported by the Facilities would cause acute toxicity to aquatic biota, or bioaccumulate within an organism to concentrations that exert a toxic effect on that organism, and/or render them unfit for consumption.

120.    On information and belief, stormwater discharges that are detrimental to aquatic wildlife, ecosystems, and/or a waterway's designated uses also adversely affect the environment.

121.    On information and belief, stormwater discharges that render waters unsuitable for a waterway's designated uses for primary contact recreation, industrial and agricultural water supply, or public potable water supplies have a reasonable likelihood of adversely affecting human health.

122.    On information and belief, since at least July 11, 2020, Defendants' stormwater discharges to the South Branch of the Rahway River Rahway River have had a reasonable likelihood of adversely affecting human health and/or the environment.

**E.    Defendants' Inadequate Pollution Prevention Practices**

123.    On information and belief, Defendants have failed and continue to fail to implement adequate pollution controls and BMPs at the Facilities; management practices at the Facilities are inadequate to minimize and/or eliminate pollution in industrial stormwater discharged to the South Branch of the Rahway River.

124.    The Facilities lacks sufficient structural controls, such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from

coming into contact with exposed areas of industrial activity. The Facilities also lacks sufficient structural controls to prevent the discharge of water once contaminated by industrial pollutants, or adequate stormwater pollution treatment technologies to treat stormwater once so contaminated.

125.     On information and belief, Defendants have failed and continue to fail to implement the basic housekeeping measures and mandatory BMPs required by the Scrap Metal Permit, as outlined above.

126.     Based on the inadequacy of pollution prevention practices; the repeated exceedances of design criteria and water quality criteria; and the visible pollution and sources of pollution observed surrounding the Facility, Plaintiff alleges that, since at least July 11, 2020, Defendants have failed to implement the BAT/BCT Standard at the Facilities as required by the Scrap Metal Permit and the Clean Water Act.

**F.      Defendants' Inadequate Pollution Prevention Plans**

127.     Defendants have failed and continue to fail to implement adequate SPPPs and DCPs for the Facilities.

128.     The Fortune 1 Facility's SPPP violates Part IV.B.4.a.ii of the Scrap Metal Permit, by failing to identify filter socks, canopies, mechanical sweeping practices, and the steel plates that are used for scrap metal processing.

129.     The Fortune 2 Facility's SPPP violates Part IV.B.4.a.ii of the Scrap Metal Permit, by failing to identify catch basin inserts.

130.     The Facilities' SPPPs both violate Part IV.B.4.a.ii of the Scrap Metal Permit by failing to address the mandatory BMPs required by Parts IV.C and IV.D of the Scrap Metal Permit.

131.     The Fortune 1 Facility's SPPP fails to address mandatory BMP requirements,

either by leaving them out entirely or by copying the language of the Permit without specifying the specific means of implementation at this Facility, as follows:

    a.    Failure to specifically indicate where fluid draining occurs.

    b.    Failure to indicate the actual facility-specific methods of storage for all oily material, e-waste, and copper.

    c.    Failure to designate the areas for storing and stockpiling all scrap material aside from metals specifically identified in Scrap Metal Permit Part IV.C.4 or to specifically indicate the methods of how runoff from said area will be minimized.

    d.    Failure to describe containment system for crusher and baler and to specifically describe how runoff from the containment system will be managed.

    e.    Failure to describe any specific measures for site stabilization and dust control.

132.    The Fortune 2 Facility's SPPP fails to address mandatory BMP requirements either by leaving them out entirely or by copying the language of the Permit without specifying the specific means of implementation at this Facility, as follows:

    a.    Failure to specifically indicate where fluid draining occurs.

    b.    Failure to indicate the actual facility-specific methods of storage for all oily material, e-waste, and copper.

    c.    Failure to designate the areas for storing and stockpiling all scrap aside from metals specifically identified in Scrap Metal Permit Part IV.C.4or to specifically indicate the methods of how runoff from said area will be minimized.

    d.    Failure to describe containment system for crusher and baler and to specifically describe how runoff from the containment system will be managed.

133.    The Fortune 1 Facility's Site Map violates Parts IV.B.4.c.i, xiv, and xv of the

Scrap Metal Permit, by failing to show, at a minimum, the following location of required aspects of the facility: the location of the Inbound scrap quality control program, the fluid storage area, and the location of implemented BMPs.

134.    The SPPPs for both of the Fortune Facilities fail to comply with Part IV.B.4.e.iii of the Scrap Metal Permit by failing to include a designated Spill Response Coordinator.

135.    The SPPP for the Fortune 2 Facility fails to comply with Part IV.B.4.f.iv of the Scrap Metal Permit by failing to maintain the required inspection log in the SPPP.

136.    Defendants have not kept the SPPPs current to reflect changes at the Facilities because remedial actions have not been made and/or have been inadequate to improve the inadequate BMPs at the Facilities.

**G.    Defendants' Violations of Their Duty to Mitigate**

137.    On information and belief, the above violations of the Scrap Metal Permit triggered the duty to mitigate the effects of Defendants' violations by taking corrective actions.

138.    On information and belief, Defendants' repeated exceedances of the Scrap Metal Permit's design criteria and narrative effluent limitations over the course of many years, coupled with Plaintiff's observations of conditions at the Facilities, demonstrate that Defendants have failed to take necessary corrective actions in order to mitigate the effects of the above violations.

139.    In addition, on information and belief, Defendants' exceedances of design criteria and New Jersey's water quality criteria for toxic pollutants evidence that Defendants' violations of the Scrap Metal Permit routinely cause discharges of pollutants at such excessive levels that they adversely affect the environment, or are reasonably likely to do so.

140.    Furthermore, on information and belief, Defendants' exceedances of New Jersey's water quality criteria for toxic pollutants evidence that Defendants' violations of the Scrap Metal Permit are reasonably likely to adversely affect human health for persons

participating in primary contact recreation or utilizing the water for industrial, agricultural, or public potable water supply, all designated uses of the South Branch of the Rahway River.

141.    On information and belief, based on the continuation of these conditions over the course of many years, Defendants have failed to take all reasonable steps to minimize or prevent activities in violation of the Scrap Metal Permit at the Facilities that have a reasonable likelihood of adversely affecting human health and/or the environment.

### H.    Stormwater Associated with Industrial Activity is Discharged from the Facility in Violation of the Scrap Metal Permit and the Clean Water Act

142.    As a result of the above acts and omissions, Defendants discharge excessively polluted stormwater associated with Defendants' industrial activities from the Facilities to the South Branch of the Rahway River.

143.    On information and belief, with the exception of the samples taken on specific dates, all of the events and circumstances described above have occurred continuously since at least July 11, 2020.

144.    Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the Scrap Metal Permit for discharges from the Facilities due to the continued discharge of contaminated stormwater. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

145.    Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the Scrap Metal Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and Best Conventional Treatment Technologies
(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

146.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

147.    The Clean Water Act, § 304(b)(2), (4), 33 U.S.C. § 1314, requires stormwater pollution control measures that reflect, and prohibits the discharge of pollutants above, the level that is commensurate with application of the BAT/BCT Standard.

148.    The Scrap Metal Permit implements the BAT/BCT Standard through its mandatory BMP requirements.

149.    The Scrap Metal Permit requires Defendants to develop, implement, update, and maintain mandatory site specific BMPs designed to minimize and/or eliminate the discharge of pollutants from the Facilities. Scrap Metal Permit, Parts IV.A.1.b, B.1.a.ii, C, D, E.

150.    On information and belief, as of the filing date of this complaint, Defendants have not implemented adequate BMPs required by the Scrap Metal Permit.

151.    The failure to implement BMPs that meet the BAT/BCT Standard is evidenced by, amongst other things, the Facilities' stormwater discharges containing pollution levels well in excess of design criteria and exceedances of water quality standards for toxic pollutants.

152.    Each and every day since July 11, 2020 on which Defendants operate the Facilities without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing and continuous.

153.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

154.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### Failure to Develop, Implement, Update, and Maintain Adequate SPPPs
### (Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)

155.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

156.    The Scrap Metal Permit requires permittees to develop, implement, update, and maintain a Stormwater Pollution Prevention Plan ("SPPP"), which includes a Drainage Control Plan ("DCP"). Scrap Metal Permit IV.A.1.a, B, F.

157.    The SPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

158.    The SPPP must describe how the discharger has implemented BMPs to minimize and/or eliminate the discharge of pollutants in stormwater and to assure compliance with the other terms of the Scrap Metal Permit, including achievement of effluent limitations.

159.    The SPPP must establish a schedule for regular inspections of BMPs, to be carried out at least quarterly. The inspections must be frequent and thorough enough to ensure that BMPs are being implemented and are functioning adequately. A record of these inspections must be maintained in the SPPP, verifying that all BMPs are in place and identifying any failures or breakdowns of BMPs.

160.    Defendants have failed to develop and implement adequate SPPPs for the Facilities. The inadequacy of the SPPPs is evidenced by, *inter alia*, the specific violations identified above, *supra* Part V.F, the inadequate stormwater control measures and BMPs at the Facility, *see supra* Parts V.E & VI. First Cause of Action, and by the Facility's longstanding and continuing discharges of excessively polluted stormwater, *see supra* Part V.D.

161.    Defendants have failed to update the SPPPs for the Facilities in response to the analytical results of the Facility's stormwater monitoring.

162.    Defendants have failed to conduct adequate inspections of sufficient frequency and in such conditions as to determine that existing BMPs are failing to minimize and/or eliminate discharges of pollutants in stormwater. On information and belief, Defendants' SPPP fails to set forth an adequate inspection schedule and procedures, or such inspection schedule and procedures are not being implemented at the Facilities.

163.    Each and every day since July 11, 2020 upon which Defendants own and/or operate the Facility without an adequate SPPP for each of the Facilities is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

164.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

165.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Mitigate Noncompliance with the Scrap Metal Permit**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

166.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

167.    The Scrap Metal Permit requires permittees to comply with all requirements incorporated by reference into the Permit, including but not limited to the New Jersey Administrative Code's sub-chapter "Conditions Applicable to All NJPDES Permits," N.J.A.C. Tit. 7, ch.14A, sub-ch. 6. Scrap Metal Permit, Part I.A.1.a.

168.    The Scrap Metal Permit incorporates the N.J.A.C.'s duty to take corrective action to cease or mitigate the effects of any permit violation. Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(11)).

169.    The Scrap Metal Permit incorporates the N.J.A.C.'s duty to minimize or prevent

any permit violation that has a reasonable likelihood of adversely affecting human health or the environment. Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(5)).

170.    On information and belief, Defendants have failed to take corrective action to cease or mitigate the effects of violations of the Scrap Metal Permit at the Facility.

171.    On information and belief, Defendants have failed to minimize or prevent discharges of stormwater containing toxic substances—namely copper, lead, and zinc, alone or in combination—in such concentrations as to have a reasonable likelihood of adversely affecting humans and/or the environment.

172.    Defendants' failure to comply with the Scrap Metal Permit's duty to mitigate the effects of their noncompliance is evidenced by, *inter alia*, the repeated exceedances of design criteria and New Jersey's water quality criteria for toxic pollutants extending back to at least July 11, 2020, and the violations of the Scrap Metal Permit alleged above, *supra* VI. First–Second Cause of Action.

173.    Each and every day since July 11, 2020 upon which Defendants own and/or operate the Facility while failing to comply with the Scrap Metal Permit's duty to mitigate requirements is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

174.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

175.    Wherefore, Plaintiff prays for relief as hereinafter set forth.

VII.    **PRAYER FOR RELIEF**

176.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.  Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.  Enjoin Defendants from discharging pollutants from the Facilities except as authorized by and in compliance with the Scrap Metal Permit;

c.  Enjoin Defendants from further violating the substantive and procedural requirements of the Scrap Metal Permit;

d.  Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendants to prepare SPPPs for the Facilities consistent with the Scrap Metal Permit's requirements and implement procedures to regularly review and update the SPPP and DCP;

f.  Order Defendants to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

g.  Order Defendants to pay civil penalties of up to the statutory maximum per violation per day, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1–19.4;

h.  Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

i.  Order Defendants to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

j.  Award any such other and further relief as this Court may deem appropriate.

Dated this 10th day of September, 2025    Respectfully submitted,

New York, NY

By: _____

Douglas Chermak
SUPER LAW GROUP, LLC
222 Broadway, 22nd Floor
New York, NY 10038
*Attorneys for Plaintiff*